110 So.2d 82 (1959)
LIBBY, McNEIL & LIBBY, a Maine corporation, authorized to do business in the State of Florida, Appellant,
v.
A.O. ROBERTS, R.C. Campbell and William G. Haynie, Appellees.
No. 488.
District Court of Appeal of Florida. Second District.
March 6, 1959.
Rehearing Denied April 1, 1959.
*83 Greene, Ayres & Greene, Ocala, for appellant.
O.B. McEwan of Sanders, McEwan, Schwarz & Mims, Orlando, W.B. Hunter, Tavares, for appellees.
SHANNON, Judge.
This is an appeal by the defendant from a final decree of the chancellor, decreeing that the equities were with the plaintiffs, ordering the defendant to remove a dam, and permanently enjoining it from obstructing a natural drainage from the lands described in the complaint.
The plaintiffs below, by their bill of complaint, prayed that the chancellor order the defendant to lower a dam on its premises to a certain elevation to permit the surface waters to freely flow through the natural drainage course so as not to create a stoppage of waters draining from the plaintiffs' lands and also to require the defendant to remove any and all parts of said obstruction which impeded and diverted the free flow of surface waters through the natural drainage course. Plaintiffs also asked the chancellor to determine the amount of damages caused by the defendant's acts.
The answer of the defendant admitted that it holds and occupies the lands described in the complaint as lessee from Florida Groves, Inc., under a lease recorded June 1, 1956. Defendant also alleged that from time immemorial until about one year prior to the filing of its answer the greater part of the lands described in the complaint as belonging to the plaintiffs formed a part of the bed of a large lake or body of water known as Little Everglades. The answer also alleged that the plaintiffs had confederated and conspired together to drain and permanently eliminate the Little Everglades and thereby to deprive the defendant and other citrus growers of the protection from cold of a large body of water, and in carrying out the said conspiracy the plaintiffs had caused and procured several culverts and ditches to be lowered several feet below the bed of the Little Everglades in an effort to drain off the waters which were theretofore retained by the natural level of the land; that to thwart the conspiracy the defendant had installed a dam across the ditch, on defendant's own property, to offset the consequences of the alleged conspiracy. The defendant also alleged that in addition to losing the cold protection by the drainage of Little Everglades, there had been a lowering of the water table and thus ensued a serious loss to its groves.
The chancellor heard the testimony and upon its conclusion entered the decree which is here under review.
The defendant has set out six points in its brief; whereas, the plaintiff takes the position that there are only two points involved in this case. From this court's study of the briefs and record in this case, it appears that there is but one pivotal question to be decided and that is, whether the Little Everglades was a lake or whether it was and is surface water or a part of the natural water course.
The general definition of "surface water" is set out in 56 Am.Jur., Waters, § 65, as follows:
"The term `surface water' is used in the law of waters in reference to a distinct form or class of water which *84 is generally defined as that which is derived from falling rain or melting snow, or which rises to the surface in springs, and is diffused over the surface of the ground, while it remains in such diffused state of condition. * * *"
And again in 3 Farnham, Waters and Water Rights, § 878, p. 2556:
"* * * In each case the question whether or not particular water is surface water is one of fact to be determined by the circumstances attending its origin and continued existence. If the water is spread out and flows sluggishly over the surface, losing itself by percolation and evaporation, it is surface water, although it has its source in springs * * *."
The definition of a "natural water course" is contained in 56 Am.Jur., Waters, § 6, as:
"The term `watercourse' is frequently defined as a stream of water flowing in a definite direction or course in a bed with banks. This definition is, for most purposes, sufficient; but a too strict adherence to it has caused confusion in some cases. A somewhat similar definition of a watercourse is that it consists of a channel, with banks, and bed, and running water. According to another definition, the distinguishing characteristic of a watercourse is the existence of a stream of water flowing for such a length of time that its existence will furnish the advantages usually attendant on streams of water; it is the condition created by a stream having a well-defined and substantial existence. A source, a current, and a place of discharge are implied. * * *"
A "lake" is defined in 56 Am.Jur., Waters, § 50, as:
"Ordinarily, the controlling distinction between a stream and a pond or a lake is that in the one case the water has a natural motion  a current  while in the other the water is, in its natural state, substantially at rest. However, the existence or nonexistence of a current is not in all cases determinative of the character of the body of water. The mere fact that water is very shallow, so that marsh grass appears above the surface; that it is called a marsh; that the water is not deep enough to admit of navigation, or that the surface is not at all times wholly submerged, does not preclude its being in fact a lake. Neither does the size or depth of a body of water solve the question whether it is a lake or a stream."
Undoubtedly, the above definitions are restrictive in nature, and many cases are found in which the facts, although appertaining to one of the definitions we have given, will be classified as another. Whether Little Everglades is one or the other we cannot say from the record. However, it is explicit from the language of the chancellor that he necessarily found that it was either surface water or a water course. His decree altogether negatives the existence of Little Everglades as a lake. His language in the final decree states in part, "further obstructing the natural drainage from the lands described in the bill of complaint." In any event his decree does impliedly find that it is not a lake, and so we come to the question of whether or not the plaintiffs were entitled to an injunction to prevent the defendant from impeding the flow of water into its land through a well-recognized ditch.
In Boynton v. Longley, 19 Nev. 69, 6 P. 437, 438, the court said:
"* * * Water seeks its level and naturally flows from a higher to a lower plane; hence the lower surface, or inferior heritage, is doomed by nature to bear a servitude to the higher surface, or superior heritage, in this: that it must receive the water that *85 naturally falls on and flows from the latter. * * *"
Following this rule of law we find an expression of its ramification in Callan v. G.M. Cypher Co., 71 Fla. 14, 70 So. 841, 844, where our Supreme Court said:
"So far as the facts are concerned, therefore, we think the chancellor's decree should not be disturbed because in a case like this, where one for the purpose of draining his lands digs ditches which empty their flow of waters into a natural drain running through his land, whether the limit of his right be the capacity of the natural drain, or whether he is subject only to the limitation of diversion, the evidence does not show that appellee exceeded his right upon the one theory or the other."
And again in Stoer v. Ocala Mfg., Ice & Packing Co., 157 Fla. 4, 24 So.2d 579, 580, which was an appeal from a decree dismissing appellant's bill of complaint in which he sought, among other things, to enjoin appellees from obstructing the natural course of the Ocklawaha river by impounding its waters and then releasing them, our Supreme Court said:
"[Appellant] * * * relies on Brumley v. Dorner, 78 Fla. 495, 83 So. 912; Payne v. Ivey, 83 Fla. 436, 93 So. 143; Arundel Corporation v. Griffin, 89 Fla. 128, 103 So. 422 and Dade County v. South Dade Farms, Inc., 133 Fla. 288, 182 So. 858, and like cases to support his contention. These cases unequivocally support the well settled rule in this country that any proprietor may drain surface waters from his lands into a natural water course provided he does not divert the natural flow of the water or overtax the water course to the injury of lower proprietors."
In Edason v. Denison, 142 Fla. 101, 194 So. 342, 343, our Supreme Court in discussing the question, stated:
"In a later case, San Gabriel Valley County Club v. Los Angeles County, 182 Cal. 392, 188 P. 554, 559, 9 A.L.R. 1200, the Supreme Court of California refused damages or injunction where defendant had by a series of artificial drains in the same locality as the natural ones had been, caused increased quantities of water at an increased speed to be carried down the natural watercourse, thereby injuring plaintiff's land by washing and by overflow. After an exhaustive review of the authorities, the court said:
"`Summing up the discussion, our conclusion, as we have stated, is that an improvement for the purposes of the drainage and protection of lands above does not give a lower riparian owner on the stream a cause of action, merely because such improvement increases the volume of water in the stream as it comes to his land, even though the burden he is necessarily under of protecting his land against the stream is thereby increased and his land is injured because of his failure to meet such increased burden, and further that the rule is not subject to the limitation that the increased volume must not be such as to make the stream exceed the capacity of its channel.'"
After studying numerous cases we have come to the conclusion that if Little Everglades was either surface water or a natural water course, the chancellor's decision must be affirmed. Since the chancellor had the witnesses before him, both pro and con, and did not ground his decision on the premise that Little Everglades was a lake, it follows that we cannot disturb the final decree.
Affirmed.
KANNER, C.J., and ALLEN, J., concur.